# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CARLTON JAMES,                                          Civil Action No. 1:07-cv-330
      Petitioner,

                                            Spiegel, J.
      vs.                                               Black, M.J.

ERNIE MOORE, WARDEN,                                    **REPORT AND**
      Respondent.                                   **RECOMMENDATION**

      Petitioner, a state prisoner, brings this case *pro se* seeking a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  This case is now before the Court upon the petition (Doc. 1), and respondent's return of writ and exhibits. (Doc. 9).[1]

## I.      PROCEDURAL HISTORY

      This case involves the following facts, as summarized by the First District Ohio Court of Appeals:[2]

*The Barnes Murder*

{¶ 4} At about 4:45 a.m. on September 16, 2002, Douglas Davis was working as a middleman for crack dealers Derrick Minor and Rashad Barnes.  Davis would stand on the sidewalk as the "front and center guy," so that the dealers could stay out of the view of any passing police officers.  If somebody wanted drugs, Davis would take the person to the dealers.

{¶ 5} Soon, Carlton James drove up to Davis in a car with a red door.  A person named Joe was with him.  The back seat of the car was full of household items, including a JVC camcorder.  Joe asked Davis if he knew anyone who would be interested in buying any of the items

{¶ 6} Davis said that Minor and Barnes might like the camcorder.  At that time,

---

[1]  Although petitioner was granted an extension of time to file a response to the return of writ, no response was filed.  *See* Docs. 10, 11.

[2]  The factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *see McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

Barnes walked up and got into James's car, and James drove off. When they returned, Barnes had the camcorder in his hand.

{¶ 7} Barnes told Davis, "[Y]ou wouldn't believe what I paid for this. * * * I gave him a 40 cent piece for it. * * * How much do you think it's worth?" Davis told Barnes that he thought the camcorder was worth about $800.

{¶ 8} About 40 minutes later, James drove up again and told Davis to get into his car. James said that he was looking for Barnes because he had to take care of some business with him.

{¶ 9} Davis directed James to Barnes. When they drove up to Barnes, Davis got out of the car and Barnes got in with James.

{¶ 10} Then, as Davis stood on a street corner talking with Minor, James and Barnes drove past them. Davis testified that James and Barnes "were in some kind of conversation. * * * They was [sic] back and forth. I don't know if they were arguing but it was back and forth."

{¶ 11} James had driven about 50 yards away when Davis heard gunshots. Davis testified that he saw James push Barnes out of the car's passenger door and drive away.

{¶ 12} Barnes crawled to the sidewalk, where he died from gunshot wounds.

{¶ 13} While the police were processing the crime scene, they learned that Barnes's car was parked nearby. They recovered a JVC camcorder from the car, but found no discernible fingerprints on it.

{¶ 14} An autopsy revealed that Barnes had been shot twice. Two .25-caliber bullets had entered the left side of Barnes's body: one entered his upper back and ripped through his aorta, while the other entered his lower back and tore through his left kidney. According to a deputy coroner, the bullet that perforated Barnes's aorta actually caused death, while the second bullet wound was potentially lethal. Testing of the two bullets recovered from Barnes's body revealed that they had been fired from the same automatic pistol.

*James: Version One*

{¶ 15} The police filed murder charges against James, but were unable to find him in the Cincinnati area. Ten months later, on July 21, 2003, James was arrested in Indianapolis, Indiana.

{¶ 16} On July 22, 2003, Cincinnati Police homicide investigators Michael Drexelius and Rob Heinlein drove to Indianapolis to interview James.

{¶ 17} At first, James denied that he had been involved in the shooting. He claimed that his car had been stolen but that he had not reported the theft to police. James then claimed that his car had broken down. After several denials, James eventually admitted that he had been involved in Barnes's shooting.

{¶ 18} James said that he had been trying to sell a camera. James did not know

2

Barnes, but he was dealing with him because Barnes was going to buy the camera. As they sat in the car, James held on his lap a pearl-handled .25-caliber semiautomatic handgun that he carried for his protection.

{¶ 19} James told the police that he knew Minor.  James said that while he and Barnes sat in his car, he looked in his rear-view mirror and saw Minor approaching. James noticed that Minor had a gun in his hand, and he thought Minor was going to kill him.  James believed that he was being set up.

{¶ 20} James said that as he reached for his gun, he got into a scuffle with Barnes. As they fought, the gun went off two times, and Barnes was shot.

*James: Version Two*

{¶ 21} At trial, despite his earlier statement to police, James called several witnesses in his defense to establish that he was asleep on the floor of his mother's apartment at the time of the Barnes murder.

{¶ 22} First, James called Darryl Walker.  Walker had seen James at a party throughout the day on September 15, and was "pretty sure" that he saw James sleeping on the floor of his mother's apartment at about 5:30 the next morning, the time of Barnes's murder.  But on cross-examination, Walker admitted that the few moments that he had seen James sleeping could have occurred anytime between 3:00 a.m. and sunrise.

{¶ 23} Walker testified that he remembered September 16, 2002, well because that was the same day that James's brother had suffered a cut to his hand and required hospital treatment.

{¶ 24} On cross-examination, Walker testified that at 5:30 on Saturday morning, he remembered seeing James sleeping on the floor.  When asked if he was aware that September 16, 2002, had fallen on a Monday, and not on a Saturday, Walker admitted that he was not.  When asked if he knew where James was on that Monday morning, Walker responded, "Like I said, what makes me only recall, only thing that makes me put the two things together was his brother getting cut.  His brother got cut that day, and that was the same incident we're talking about now."

{¶ 25} Defense witness John Farris testified that he saw James on the day that James's brother had cut his hand.  Farris said that he saw James at about 5:30 or 6:00 a.m. on September 16, 2002, just as James was going to sleep.

{¶ 26} Next, James's brother, Steven Griffin, testified that on September 16, 2002, he had cut his hand at about 1:00 or 2:00 in the morning and had gone to a hospital for treatment.  He said that James and his mother picked him up from the hospital at about 9:00 that morning.  James was driving a van at that time.

{¶ 27} Griffin testified that his then-girlfriend's car was a Plymouth Neon with a red door, and he identified a photograph of the car.  The same photograph had earlier been identified by Davis as the car James had driven when he shot Barnes.

{¶ 28} James took the stand in his own defense.

{¶ 29} James said that on September 16, 2002, at about 1:00 a.m., Griffin was cut and went to the hospital with his girlfriend and Jay Morris. Griffin told a person named Justin to take the girlfriend's car and to pick him up later at the hospital.

At about 2:00 a.m., James said, he went to his mother's apartment and slept. Then at about 4:00 a.m., a person named J.R. knocked on the door and asked where Morris was. James told J.R. to check upstairs. At about 7:00 a.m., J.R. banged on the door and told James that Morris had been driving James's car and had been pulled over by police.

{¶ 30} James said that later that week, he learned from a news report that the police were seeking information about a white car in connection with Barnes's murder. James testified that his own car was white, and that the police had already impounded it. James said that he had left his car in the impound lot because he knew that Morris had been out stealing radios when he used the car, "[s]o they ain't no telling what they was out there doing."

{¶ 31} James testified that when the Cincinnati homicide investigators interviewed him, he told them that he had never driven a car with a red door, that he had been home sleeping on September 16, 2002, at 5:30 a.m., and that his car had been stolen that night. But, James testified, the investigators would not listen to him. During a break in the interview, James said, Officer Drexelius beat him up in the bathroom, punched him in the head and body, and injured his finger. Because he was so concerned about further serious injury, James testified, he gave a taped statement to police that implicated himself in Barnes's murder.

{¶ 32} James testified that he had reported his finger injury upon his arrival at the jail in Cincinnati. He said that the jail nurse had lied when she completed an intake form that indicated he had not complained of an injury.

{¶ 33} James denied shooting Barnes. But James admitted that he had left Cincinnati for Indianapolis when he learned that the police were looking for him.

*The Alibi Unraveled*

{¶ 34} In rebuttal, the state presented the testimony of a hospital representative who authenticated medical records for Steven Griffin's emergency-room visit. The visit had occurred on September 13, 2002, three days before Barnes was shot.

(Doc. 9, Exh. 16 at 2-7).

On August 4, 2003, the Hamilton County, Ohio, grand jury issued an indictment charging

petitioner with three counts of murder as defined in Ohio Rev. Code § 2903.02, with attached

firearm specifications on each. Counts two and three related to the death of Rashad Barnes on

4

September 16, 2002.  Count one involved the death of Tony Johnson on May 25, 2002. (*See* Doc. 9, Exh. 1).

The trial court held a hearing on petitioner's motion to suppress his statements to police. On  November 14, 2003, the court overruled the motion. (Doc. 9, Exh. 31 at Tr. 85).

The 2004 Term of the Hamilton County Grand Jury indicted petitioner for two counts of carrying a concealed weapon as defined in Ohio Rev. Code § 2923.12(A) (counts one and three) and two counts of having a weapon while under disability as defined in Ohio Rev. Code § 2923.13(B) (2) (counts two and four). (Doc. 9, Exh. 2).  Counts one and two related to the May 2002 incident and counts three and four related to the September 2002 incident. *Id.*

The case involving the September 2002 death of Rashad Barnes was tried to a jury.  On May 14, 2004, petitioner was found guilty of murder and guilty of having weapons while under a disability.  Petitioner was found not guilty of carrying a concealed weapon. (Doc. 9, Exhs. 3, 4; Exh. 31 at Tr. 666-668, 668-669).

On June 3, 2004, after merging the murder counts and the gun specifications, the trial court sentenced petitioner to fifteen years to life, with a consecutive three-year sentence for the firearm specification. (Doc. 9, Exh. 5; Exh. 31 at Tr. 684-686).  The trial court also sentenced petitioner to a five year consecutive sentence for having weapons under a disability (Doc. 9, Exh. 6; Exh. 31 at Tr. 681) for a total aggregate sentence of 23 years to life imprisonment.

The case involving the May 2002 death of Tony Johnson was resolved by plea agreement. Petitioner pleaded guilty to a reduced charge of voluntary manslaughter and to having a weapon while under disability (Doc. 9, Exhs. 7, 8), with the gun specification and concealed weapons charge dismissed. (Doc. 9, Exh. 31 at Tr. 734-735, 747-748).  Petitioner was sentenced to an agreed

5

sentence of ten years imprisonment for voluntary manslaughter and five years for having a weapon

while under disability, to be served consecutive to each other, but concurrently to the previous

sentence imposed on the September 2002 incident. (Doc. 9, Exhs. 9, 10; Exh. 31 at Tr. 748-750).

With the assistance of new counsel, petitioner appealed to the Ohio Court of Appeals, First

Appellate District,[3] raising the following assignments of error:

> 1. The jury erred to the prejudice of the defendant-appellant by finding him guilty of murder and weapons under disability, as those findings were not supported by sufficient evidence.

> 2. The jury erred to the prejudice of the defendant-appellant by finding him guilty of murder and weapons while under disability, as those findings were contrary to law.

> 3. The trial court erred to the prejudice of the defendant-appellant by overruling his motion for acquittal under Ohio Criminal Procedure Rule 29.

> 4. The trial court erred to prejudice of defendant-appellant by not granting his motion to suppress his statement.

> 5. The trial court erred to the prejudice of defendant-appellant by allowing the prosecution to dismiss three black jurors.

> 6. Defendant-appellant was denied his rights of due process and of assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution because his trial counsel provided ineffective assistance of counsel.

> 7. The trial court erred to the prejudice of defendant-appellant by utilizing sentencing procedures which are unconstitutional.

> 8. The trial court erred to the prejudice of defendant-appellant by imposing a sentence that is contrary to law.

> 9. The trial court erred to the prejudice of defendant-appellant by not sustaining his objection regarding his carrying a gun.

(Doc. 9, Exh. 14).

---

[3] Two notices of appeal were filed on behalf of petitioner, one pro se and the other through counsel. Both were consolidated by the Court of Appeals. (Doc. 9, Exhs. 11, 12, 13).

6

The State filed a response (Doc. 9, Exh. 15), and, on May 19, 2006, the Ohio Court of Appeals overruled all but one of petitioner's assignments of error and affirmed the trial court's judgment. (Doc. 9, Exh. 16). Petitioner's seventh assignment of error was sustained and petitioner's sentence was vacated and remanded for resentencing in accordance with *Blakely v. Washington*, 542 U.S. 296 (2004) and *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470 (2006). (Doc. 9, Exh. 16).

Petitioner, through counsel, appealed further to the Supreme Court of Ohio. (Doc. 9, Exh. 17). Petitioner raised the following propositions of law:

1. The jury erred to the prejudice of the appellant by finding him guilty of murder and weapons under disability, as those findings were not supported by sufficient evidence, and the State failed to meet its burden of proof.

2. The jury erred to the prejudice of the appellant by finding him guilty of murder and weapons under disability, as those findings were contrary to law and were against the manifest weight of the evidence.

3. The trial court erred to the prejudice of appellant by overruling his motion for acquittal under Criminal Procedure Rule 29, as the State failed to meet its burden of proving appellant guilty of murder and weapons under disability.

4. The trial court erred to the prejudice of appellant by allowing the prosecution to dismiss three black jurors because of their race.

5. The trial court erred to the prejudice of appellant by not granting his motion to suppress his statement, as appellant was denied his right to counsel and was physically threatened by the police.

6. Appellant was denied his right of due process and assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution because his trial counsel provided ineffective assistance by advising appellant to plead guilty instead of no contest, foreclosing his right to appeal the denial of his motion to suppress.

7. The trial court erred to the prejudice of appellant by not sustaining his objection and allowing the prosecution to question him about carrying a gun.

(Doc. 9, Exh. 18).

7

The State filed a response. (Doc. 9, Exh. 19). On October 4, 2006, the Supreme Court of Ohio declined jurisdiction to hear the case and dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Exh. 20).

On April 19, 2007, petitioner filed the instant federal habeas corpus petition. (*See* Doc. 1). In the petition, petitioner alleges seven grounds for relief:

> **GROUND ONE:** Jury erred to prejudice appellant by finding him guilty of murder and weapons under disability, as those findings were not supported by sufficient evidence, and State failed to meet burden of proof.
>
> Supporting Facts: No gun, no forensic evidence used or found to link appellant to crime. State's main witness was admitted drug dealer and could not have seen crime due to being on a bus.
>
> **GROUND TWO**: Jury erred to prejudice appellant finding him guilty, as findings were contrary to law, and were against the manifest weight of the evidence.
>
> Supporting Facts: Jury lost its way and created a manifest miscarriage of justice.
>
> **GROUND THREE**: Trial court erred to prejudice appellant overruling his motion for acquittal, as State failed to meet its burden of proving appellant guilty.
>
> Supporting Facts: Evidence was so slight, as a matter of law, it was insufficient to support jury's decision.
>
> **GROUND FOUR**: Trial court erred to prejudice appellant by allowing the prosecution to dismiss 3 black jurors because of their race.
>
> Supporting Facts: Batson challenges were made at several junctions of voir dire because prosecution dismissals of 3 black jurors.
>
> **GROUND FIVE**: Trial court erred to prejudice appellant by not granting motion to suppress his statement, as appellant was denied his right to counsel and was physically threatened by the police.
> Supporting Facts: Appellant was physically abused causing his waiver of rights to be involuntary. Appellant was further questioned prior to being advised of right to counsel.
>
> **GROUND SIX**: Appellant was denied his rights of due process and assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments of the U.S.

Constitution, Article I, Section 10 and 16 of the Ohio Constitution because trial counsel provided ineffective assistance by advising appellant to plead guilty instead of no contest, foreclosing his right to appeal the denial of his motion to suppress.

Supporting Facts: Trial counsel did not advise appellant that by pleading guilty would foreclose the possibility of appealing the Court's overruled motion to suppress. Appellant's plea was involuntarily given.

**GROUND SEVEN**: Trial court erred to prejudice appellant by not sustaining his objection and allowing the prosecution to question him about carrying a gun.

Supporting Facts: Trial court initially granted appellant's motion in limine concerning a pistol unrelated to the crime that appellant possessed. The court reversed itself through cross-examination.

(Doc. 1 at 6-11(b)).

## II. STANDARD OF REVIEW

On federal habeas review, the factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This Court is bound by the state court adjudications unless those decisions are contrary to or an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104- 132, 110 Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9

28 U.S.C. § 2254(d).

> The phrases "contrary to" and "unreasonable application" have independent meanings:

> A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in . . . [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts.  The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case.  The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable . . . and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).

Upon review of the entire record, this Court concludes that petitioner has failed to establish that the findings of the state appellate court are unreasonable as to justify federal habeas corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).

## III.  GROUNDS ONE AND THREE OF THE PETITION ARE WITHOUT MERIT.

In his first and third grounds for relief, petitioner contends his murder conviction and related conviction of having weapons while under disability were not supported by sufficient evidence.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case from conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *Jackson v. Virginia*, 443 U.S. 307, 316  (1979); *In re Winship,* 397 U.S. 358, 364 (1970).  In analyzing claims of insufficient evidence, the Court must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).  This standard reserves to the trier of fact the responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable

inferences from the basic facts to the ultimate facts. *Id.* at 318-319.

On habeas corpus review, the federal court conducts an independent review of the state court record in analyzing petitioner's sufficiency of the evidence claim. *Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006). However, the Court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Id.* In addition, circumstantial evidence may be sufficient to support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *See Jackson,* 443 U.S. at 326; *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995); *Jamison v. Collins,* 100 F. Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002).

In the instant case, the First District Court of Appeals overruled petitioner's insufficiency of evidence claim as follows:

> {¶ 35} In his first, second, and third assignments of error, James challenges the weight and sufficiency of the evidence upon which his murder and weapon-under-disability convictions were based, as well as the trial court's denial of his Crim. R. 29 motions for acquittal.
>
> {¶ 36} To determine whether a trial court has erred in overruling a Crim. R. 29 motion for acquittal, the question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. We make the same inquiry in reviewing the sufficiency of the evidence.
>
> {¶ 37} In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.
>
> {¶ 38} James was indicted for murder under R.C. 2903.02(A), and for felony murder under R.C. 2903.02(B). To find James guilty of murder, the jury had to find that

11

James had purposely caused the death of Barnes.  To find James guilty of felony murder, the jury had to find that Barnes's death had proximately resulted from James's commission or attempted commission of an offense of violence.  A conviction for felony murder, with the underlying offense being felonious assault, is predicated upon evidence that the defendant knowingly caused physical harm to the victim.

{¶ 39} Following our review of the record, we hold that the state presented sufficient evidence of murder.  The jury could have reasonably found that James's repeated firing of a loaded gun at close range into Barnes's back evinced a purpose to kill.  In view of our conclusion with respect to the murder conviction, it necessarily follows that there was sufficient evidence that James had knowingly caused physical harm with a deadly weapon to justify his felony-murder conviction.

{¶ 40} As for the weapon-under-disability conviction, James stipulated that he was under disability at the time of the offense, as defined by R.C. 2923.13.  Given the state's evidence that James had used an automatic firearm, his conviction for having a weapon while under a disability was supported by sufficient evidence.

{¶ 41} James argues that he should not have been convicted upon the testimony of Davis, an admitted drug user, especially in light of James's alibi evidence.  But the evaluation of the credibility of the witnesses was for the jury.  Given James's admission to police that he had shot Barnes in a manner that corroborated Davis's account of the shooting, as well as the utter collapse of James's alibi, this is hardly the "exceptional case in which the evidence weighs heavily against the conviction."

{¶ 42} Accordingly, we hold that James's convictions were based upon sufficient evidence and were not against the manifest weight of the evidence, and that the trial court properly denied his motions for judgments of acquittal.  We overrule the first, second, and third assignments of error.

(Doc. 9, Exh. 16 ) (internal footnotes omitted).


Upon review of the entire record, this Court agrees with the finding of the state court of

appeals that the evidence supported a finding of guilt beyond a reasonable doubt.  Petitioner

contends that the State failed to present sufficient evidence to support the murder or weapon-under-

disability convictions.  He contends no gun or forensic evidence tied him to the crimes and the

State's eyewitness was an admitted drug dealer who could "not have seen [the] crime due to being

on a bus." (Doc. 1 at 6).[4]

Murder is defined as purposely causing the death of another. Ohio Rev. Code § 2903.02 (A). Felony murder is defined as causing the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence, in this case felonious assault. Ohio Rev. Code § 2903.02(B).

The State presented the testimony of Douglas Davis. Mr. Davis testified that he arranged for Rashad Barnes to buy a camcorder from petitioner on the morning in question. Davis stated that after he exited petitioner's vehicle, Barnes entered the vehicle. Davis observed petitioner and Barnes in a "back and forth" conversation as the car rolled away about 50 yards. Davis stated he then heard gunshots and ran to the corner to observe the scene. Davis testified he observed petitioner's car door open and petitioner push Barnes out the door and onto the sidewalk. Davis testified he then observed petitioner drive away. (Doc. 9, Exh. 31 at Tr. 317-324).

The State also presented evidence that petitioner confessed to the killing when questioned by police in July 2003. (*Id.* at Tr. 393). Officer Drexelius testified that upon meeting petitioner in Indiana, petitioner was advised of his *Miranda* rights. (*Id.* at Tr. 396). Petitioner indicated he understood his rights and signed the *Miranda* form. (*Id.* at Tr. 399). Petitioner initially denied being present at the crime scene (*Id.* at Tr. 400), but then admitted he was involved. (*Id.* at Tr. 401). Petitioner told police that while he was sitting in the car with Barnes, petitioner observed through his rearview mirror Derrick Minor approach the car with gun in hand. Petitioner felt threatened and reached for the .25 semi-automatic handgun he kept in the car for protection. Petitioner told the police officers that he got into a scuffle with Barnes and the gun went off two times, killing Barnes.

---

[4] The Court has reviewed Mr. Davis's testimony in its entirety and finds no evidence that Mr. Davis was on a bus at the time he observed the incident.

13

(*Id*. at Tr. 403-404).  The confession was later tape recorded by the officers. (*Id*. at Tr. 404, 407).
The police recovered a .25 caliber shell casing at the scene (*Id.* at Tr. 356) and the coroner removed
two bullets from Barnes which had entered his body through his back. (*Id.* at Tr. 448, 452-53).  The
coroner testified that the manner of death was homicide. (*Id*. at Tr. 458).

Petitioner presented an alibi defense at trial.  His alibi witnesses testified that petitioner was
at home sleeping on the morning of the killing and that they remembered the particular day because
petitioner's brother had been taken to the hospital for treatment of a cut hand that same day. (*Id*. at
Tr. 468-474, 485-491, 563-567).  Petitioner's alibi witnesses were discredited when the State
presented evidence that petitioner's brother was admitted to the emergency room for injuries three
days prior to Barnes's killing. (*Id*. at Tr. 575).

In his defense, petitioner testified that his confession was coerced by Officer Drexelius who
allegedly physically assaulted petitioner. (*Id*. at Tr. 518).  Officer Drexelius denied using any force
to extract a confession from petitioner. (*Id*. at Tr. 577-578).

The eyewitness testimony from Davis and petitioner's confession to police, when viewed in
conjunction with the shooting of Barnes in the back at close range, was sufficient evidence from
which any rational trier of fact could find petitioner guilty of murder and felony murder beyond a
reasonable doubt.  While petitioner contends his conviction should not be based on the testimony of
a drug dealer, Davis's credibility was a question of fact for the jury which this Court cannot re-
determine on the basis of the record before it. *Jackson*, 443 U.S. at 318-19.  Petitioner's alibi
defense, as well as his testimony at trial which conflicted with his statements to police, likewise
raised issues of credibility which the jury ultimately assessed against petitioner.

"*Jackson*  makes clear that 'a federal habeas corpus court faced with a record of historical

14

facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *O'Hara v. Brigano,* 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 326).  The jury could have reasonably believed Davis's version of events and petitioner's statements to police while discrediting petitioner's trial testimony and alibi defense.

Although petitioner also argues the police failed to locate the murder weapon and there was no forensic evidence, a jury's verdict may be based on entirely on circumstantial evidence. *O'Hara*, 499 F.3d at 500.  When viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, and for the reasons discussed by the state appellate court, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's convictions for murder and felony murder.

Likewise, the Court determines that the evidence was constitutionally sufficient to support a conviction for having a weapon while under disability, which prohibits a person from knowingly using a firearm when he "has been convicted of any felony offense of violence." Ohio Rev. Code § 2923.13(A)(2).  Petitioner's confession to police, Davis's eyewitness account, and the evidence of petitioner's prior conviction for aggravated burglary (Doc. 9, Exh. 31 at Tr. 417-418, 465), when viewed in the light most favorable to the prosecution, could lead any rational trier of fact to conclude the essential elements of having a weapon while under disability were satisfied beyond a reasonable doubt.

The Ohio Court of Appeals' determination that sufficient evidence supported petitioner's convictions for murder and having a weapon while under disability was therefore not contrary to or an unreasonable application of clearly established federal law.  *See Jackson*, 443 U.S. at 319.

Therefore, Grounds One and Three of the petition are without merit and should be denied.

**IV.  GROUND TWO IS NOT COGNIZABLE IN HABEAS CORPUS.**

In Ground Two of the petition, petitioner asserts his convictions were against the manifest

weight of the evidence.  A "manifest weight of evidence" claim, which is based on a state law

concept that is "both quantitatively and qualitatively different" from a constitutional due process

sufficiency of evidence standard, *see Tibbs v. Florida,* 457 U.S. 31, 41-47 (1982), and *State v.

Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546 (1997), *superseded by state constitutional

amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), raises an

issue of state law only that is not cognizable in a federal habeas corpus proceeding such as this.  *See*

28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

The Due Process Clause does not provide relief for defendants whose convictions are against

the manifest weight of the evidence, but only for those who have been convicted without proof

sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*,

703 F.2d 959, 969 (6th Cir.), *cert. denied*, 464 U.S. 962 (1983).  In the context of a claim alleging a

violation of due process, "sufficiency of the evidence" refers to the due process requirement that

there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find

each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

However, under Ohio law, a claim that a verdict was against the manifest weight of the

evidence–as opposed to one based upon insufficient evidence–requires the appellate court to act as a

"thirteenth juror" and to  review the entire record, weigh the evidence, and consider the credibility of

witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage

of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio

App.3d 172, 175, 485 N.E.2d 717, 720 (1st Dist. Ohio 1983); *cf. Tibbs v. Florida*, 457 U.S. 31

(1982).  Since a federal habeas court does not function as an additional state appellate court, vested

with the authority to conduct such an exhaustive review, petitioner's claim that his convictions were

against the manifest weight of the evidence cannot be considered by this Court.

      Therefore, petitioner's second claim should be dismissed as non-cognizable.

## V.  GROUND FOUR OF THE PETITION IS WITHOUT MERIT.

      In Ground Four of the petition, petitioner alleges that he was denied his Fourteenth

Amendment rights to equal protection and due process when the trial court "allow[ed] the

prosecution to dismiss 3 black jurors because of their race" in violation of *Batson v. Kentucky,* 476

U.S. 79 (1986). (Doc. 1 at 10).

      Exclusion of individuals from a jury based on race violates the Equal Protection Clause of

the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Batson* forbids race-based

peremptory challenges by a prosecutor.  A trial court must engage in a three-step process to evaluate

a *Batson* claim:

> First, a defendant must make a prima facie showing that a peremptory challenge has
> been exercised on the basis of race.  Second, if that showing has been made, the
> prosecution must offer a race-neutral basis for striking the juror in question. Third, in
> light of the parties' submissions, the trial court must determine whether the defendant
> has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-329 (2003) (internal citations to *Batson* omitted).

      To make a *prima facie* showing of purposeful discrimination by the prosecutor, a defendant

must show he is a member of a cognizable racial group; the prosecutor has exercised peremptory

challenges to remove from the jury members of the defendant's race; and any additional facts and

circumstances from which an inference could be drawn that the prosecutor used the peremptory

challenges to exclude persons from the petit jury on account of their race. *Batson,* 476 U.S. at 96.

Once the defendant makes a *prima facie* showing of purposeful discrimination, the burden shifts to the State to come forward with a race-neutral explanation for challenging black jurors. *Batson,* 476 U.S. at 97.  This is an extremely light burden. *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam).  At this step of the inquiry, the explanation tendered by the prosecutor need not be persuasive nor even plausible. *Id.*  As the Court explained in *Hernandez*:  "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.  At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360 (plurality opinion).

At the third step of the process, the court must determine whether the defendant has established purposeful discrimination. *Hernandez,* 500 U.S. at 359, 363 (plurality opinion) (citing *Batson,* 476 U.S. at 98).  In making this determination, the trial court must assess the plausibility and persuasiveness of the prosecutor's race-neutral explanation. *Rice v. Collins,* 546 U.S. 333, 338 (2006); *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005).  "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett,* 514 U.S. at 768.  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke,* 545 U.S. 231, 241 (2005).

The trial court's decision at this step is accorded "great deference" by a reviewing court. *Hernandez,* 500 U.S. at 364 (plurality opinion); *see also Batson,* 476 U.S. at 98 n.21.  "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context

18

because . . . the finding 'largely will turn on evaluation of credibility.'" *Hernandez,* 500 U.S. at 365 (plurality opinion) (quoting *Batson,* 476 U.S. at 98 n.21)).

In the typical case, the decision will turn on whether counsel's race-neutral explanation for a peremptory challenge should be believed, wherein there "will seldom be much evidence bearing on that issue" and the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"*Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428 (1985)). In determining the credibility of the prosecutor's race-neutral explanations, the Court must consider the prosecutor's demeanor, how reasonable or how improbable the explanations, and whether the proffered explanation has some basis in accepted trial strategy. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

A trial judge's ruling that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Snyder v. Louisiana,* 128 S.Ct. 1203, 1207 -1208 (2008) (citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991)(plurality opinion)). In federal habeas corpus proceedings such as this, the state courts' factual findings on this issue are presumed correct unless petitioner demonstrates by clear and convincing evidence that such findings are erroneous. 28 U.S.C. § 2254(e)(1); *Purkett,* 514 U.S. at 769; *Hernandez,* 500 U.S. at 366 (plurality opinion). "Thus, a federal habeas court can only grant [the] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice,* 546 U.S. at 338.

In this case, the *Batson* issue arose when the prosecutor exercised peremptory challenges to excuse three African-American, prospective jurors. The State exercised a peremptory challenge against Prospective Juror Robert White. (Doc. 9, Exh. 31 at Tr. 247). Petitioner objected based on

*Batson v. Kentucky*. (*Id*. at Tr. 247).  In support of the challenge, the prosecutor stated concerns with a delay in Mr. White's completion of his jury questionnaire (*Id*. at Tr. 248) when none of the other jurors had problems completing the questionnaires. (*Id*. at Tr. 251).  The prosecutor also raised a concern with the ability of Mr. White, who was 79 years of age, to be attentive during the trial.  The prosecutor stated, "it appears to us that he's barely staying awake" and "we have serious concern on whether he could stay awake and attentive throughout the proceedings." (*Id*. at Tr. 249).  The trial court had previously received word from the jury commissioner that Mr. White "was having trouble completing the questionnaire and it was going to take some time." (*Id.* at Tr. 146).  Based on the "reasonable" explanations offered by the prosecution, the trial judge excused Mr. White as a juror. (*Id.* at Tr. 252).

The prosecutor also exercised peremptory challenges to excuse prospective jurors Number 5, Mr. Lawson, and Number 12, Mr. West.   Defense counsel objected on the basis of *Batson*. (*Id*. at Tr. 261-262).  By way of explanation, the prosecutor stated:

> I will put on a reason for Number 12.  I think it was an obvious bump.  We noted that when he first came into the courtroom, and when the jurors were first given their oath–and Mr. Kadon and I both noticed this–he didn't even raise his right hand. He kept it down around his stomach and he did not verbalize.  He didn't say I do.  At one point he indicated he had a problem with employment.  And then later he said please don't worry about it.  Our biggest concern was at the end of Mr. Kadon's questioning he asked him a question.  It was: Where did you guys get these questionnaires?

> It gives you a sense that he was concerned that people knew things about him. Just the overall picture with him.  He appeared to just not trust neither Mr. Wenke [defense counsel] nor us.  In fact, we had talked about it earlier, defense counsel and us, that both of us felt uncomfortable with him.

> With reference to Mr. Lawson, our concerns with him and it would be the same with Mr. Jackson.  These two people worked together for a number of years at a place.

In fact, that's actually a question I just started asking in the last couple of years, 'cause I had a case where unbeknownst to me a couple of jurors did know each other.  We found out later.  And I was uncomfortable having people on a jury that have worked together, or socialized together for a long period of time because I don't think they constitute a jury with independent people.

The fact that these two people worked together, knew each other, while I was questioning Mr. Lawson at one point Mr. Jackson actually spoke up and answered a question that I had asked the other juror.

So it's just a concern that we really don't have an independent voice for all these people.  And that's the reason.  To be honest, it could have been either one of them that was excused, but we're asking to excuse Prospective Juror Number 5 just 'cause I do not like the fact that they worked together.

One thing we would like to point out, we did waive one of our peremptories and even using this peremptory, Prospective Juror Number 6 [Mr. Jackson], Number 8, Number 9, and 10, are all African Americans.  So if we wanted to use all four peremptories on African Americans, we could.

We actually waived, so we have not done that.

(*Id*. at Tr. 262-264).

The trial court noted that although defense counsel had made a *prima facie* case, the prosecutor offered a race neutral reason and allowed the prosecutor to use the challenge. (*Id*. at Tr. 266).[5]

Petitioner challenged the trial court's rulings on direct appeal.  The Ohio Court of Appeals, which was the last state court to render a reasoned decision addressing the merits of petitioner's *Batson* claim, properly considered the issue utilizing the three-step analysis discussed above, *see supra* p. 18, as clearly established by Supreme Court precedents.  The Court of Appeals rejected petitioner's claim of constitutional error, reasoning in pertinent part as follows:

{¶ 58} In this case, the prosecutors exercised their first peremptory challenge against

---

[5]  Prospective juror Number 12, Mr. West, had previously been excused when the prosecutor used a peremptory challenge. (Doc. 9, Exh. 31 at Tr. 238).

prospective juror West, an African-American. The prosecutors noted that West had refused to raise his right hand or to verbalize a response when the prospective jurors were being sworn. During voir dire, West indicated that he had a scheduling conflict, but then told counsel not to worry about it. At one point, West asked counsel where the jury questionnaires had come from and who had completed them. In explaining their challenge, the prosecutors said that West seemed concerned that people knew things about him. They said that West seemed not to trust them or defense counsel, and that they felt uncomfortable with him.

{¶ 59} In support of their challenge to a second African-American, prospective juror White, the prosecutors presented several explanations. First, the prosecutors pointed out that the start of the trial had been initially delayed, due in part to White's difficulty in completing a juror questionnaire. None of the other prospective jurors had had similar difficulty. Second, White was 79 years old and was "barely staying awake" during voir dire, so the prosecutors were concerned that he would be unable to remain awake and attentive throughout the proceedings.

{¶60) In exercising their final peremptory strike, the prosecutors challenged prospective juror Lawson, an African-American. During voir dire, Lawson had indicated that he and prospective juror Jackson had worked together for the same employer for a number of years. One of the prosecutors explained that he was not comfortable having people on a jury that had worked together or socialized together for a long period of time because, as he stated, "I don't think they constitute a jury with independent people." The prosecutor noted that when he directed a question to Lawson, Jackson had responded instead, thereby confirming the prosecutor's concern that the two former co-workers would not maintain the "independent voice[s]" necessary for full and fair deliberations.

{¶ 61} The trial court accepted the prosecutors' race-neutral explanations for the challenges and concluded that James had not demonstrated that the challenges were racially motivated. We give great deference to the trial court's findings with respect to the prosecutors' lack of discriminatory intent. Because the trial court had the opportunity to observe the demeanor of the attorneys who exercised the challenges, it was in a better position to evaluate the attorneys' credibility. We find no abuse of discretion by the trial court in allowing the state to exercise its peremptory challenges against prospective jurors West, White, and Lawson.

(Doc. 9, Exh. 16 at 13-14) (footnotes omitted).

This Court concludes that the First District Court of Appeals' decision on petitioner's *Batson* claim was not an objectively unreasonable application of *Batson* and its progeny. Petitioner

established that he and the three prospective jurors who were excused are African American. However, the explanations given by the prosecution were facially valid and race neutral. In addition to the reasons set forth by the Court of Appeals, this Court notes that the record reflects that Mr. Jackson, the prospective juror with whom Mr. Lawson worked, was also African American and was not stricken from the jury. (Doc. 9, Exh. 31 at Tr. 184, 198). Thus, this is not a case where the prosecutor's proffered explanation for striking an African American juror applied to an otherwise-similar non-African American juror who was permitted to serve. *Cf. Dretke*, 545 U.S. at 241. Both Jackson and Lawson were African American and only one of the two was excused. The record also supports prospective juror West's concerns about the questionnaires. (Doc. 9, Exh. 31 at Tr. 225-226). The trial judge accepted these explanations as credible and petitioner has not met his burden of showing that it was "unreasonable to credit the prosecutor's race-neutral explanations." *Rice,* 546 U.S. at 338. Petitioner has failed to demonstrate by clear and convincing evidence that such findings are erroneous. 28 U.S.C. § 2254(e)(1). Moreover, upon review of the trial transcript, this Court agrees with the Ohio Court of Appeals' determination that the record supports the factual bases for the state's peremptory challenges as to prospective jurors White, West, and Lawson.

Accordingly, petitioner has not demonstrated that the state courts' adjudication of his *Batson* claim resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent, or is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. §2254(d); *see also Williams,* 529 U.S. at 402-03 (O'Connor, J.).

Further, petitioner has neither cited nor submitted clear and convincing evidence of purposeful discrimination by the prosecution sufficient to rebut the presumption of correctness to be

accorded the state courts' conclusion that the prosecutor did not discriminate on the basis of race in exercising the peremptory challenges in this case. *See* 28 U.S.C. § 2254(e)(1); *Purkett,* 514 U.S. at 769; *Hernandez*, 500 U.S. at 364-66; *Batson*, 476 U.S. at 98 n.21.

Petitioner, therefore, is not entitled to habeas corpus relief based on his *Batson* claim alleged in Ground Four of the petition.

## VI.  GROUND FIVE OF THE PETITION IS WITHOUT MERIT.

In Ground Five of the petition, petitioner asserts that he was denied his right to counsel and physically threatened by police when he was questioned about and confessed to the murder of Rashad Barnes.  Petitioner contends that his statements were not voluntarily made, but coerced by physical abuse by the police, and that the trial court erred by not granting the motion to suppress his confession to police.

In overruling this assignment of error, the First District Ohio Court of Appeals on direct appeal made the following findings regarding this claim:

{¶ 43} In his fourth assignment of error, James argues that the trial court should have suppressed his statements to police because the statements were obtained in violation of *Miranda v. Arizona.* James claims that he had been denied his right to counsel and that he had been physically threatened by police.

{¶ 44} In determining whether a pretrial statement was involuntarily made, a trial court must consider the totality of the circumstances, "including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."  The same considerations apply to whether James understood and voluntarily waived his *Miranda* rights.

{¶ 45} At the suppression hearing, Officer Drexelius testified that he and Officer Heinlein had interviewed James. James told the officers had he had completed the eleventh grade, that he could read and write, and that he was not under the influence of alcohol or drugs. James said that he had asthma and a sinus allergy, but that he did not require medication for either at the time. Drexelius told James that they could not make him any promises or deals.

24

{¶ 46} Drexelius advised James of his *Miranda* rights by reading to him from a notification-of-rights form. James indicated that he understood his rights, agreed to waive his rights, and signed the waiver.

{¶ 47} Following the waiver, Drexelius began questioning James about Barnes's murder. Initially, the interview was not tape-recorded. But following James's agreement, the officers began to tape-record the interview. At one point during the taped portion of the interview, James reaffirmed that he had been advised of his *Miranda* rights and that he had agreed to the interview.

{¶ 48} Then the officers took a short break before questioning James about the murder of Tony Johnson. Again the officers reminded James of his *Miranda* rights, and James confirmed the advisement.

{¶ 49} At no time did James halt the questioning or request an attorney. James was escorted to the restroom two times. Drexelius did not recall whether he had escorted James to the restroom for the first trip. During James's second trip to the restroom, Drexelius accompanied him. Before allowing James to go into the restroom, Drexelius looked inside. Drexelius allowed James to go into the restroom but not to shut the door completely. Drexelius waited outside the door. Drexelius noticed no change in James's demeanor or appearance following either restroom trip.

{¶ 50} Drexelius testified that neither he nor Heinlein had threatened James or had had physical contact with him. Drexelius testified that no complaints stemming from James's arrest had been lodged against him. Drexelius testified that there had been no animosity between himself and James, and that the two men had referred to each other by their first names.

{¶ 51} At the suppression hearing, James testified that he had requested an attorney as soon as he met with the officers. According to James, Drexelius told him that he would not get an attorney until he got back to Cincinnati. James said that the officers did not advise him of his *Miranda* rights. He said that he signed two or three documents a few hours into the interview.

{¶ 52} James testified that when Drexelius escorted him to the restroom, James told him that he did not want to talk to him until he got an attorney. James said that Drexelius entered the restroom, slammed him into the wall, and punched him repeatedly. Drexelius threatened to spray Mace on James if he did not say what he wanted him to say. James testified that he was scared because he did not know what was going to happen, and that Drexelius continued to threaten him. Drexelius escorted him to the bathroom again and told James what he wanted him to say.

{¶ 53} James estimated that he had requested an attorney three or four times. James said that his taped statements were not voluntarily made because he was scared that

he was going to be beaten again.

{¶ 54} In a suppression hearing, the trial court is in the best position to decide the facts and to evaluate the credibility of the witnesses. Here, the trial court found Drexelius's testimony to be more credible than that of James. The court concluded that James had been properly advised of his *Miranda* rights, and that he had knowingly, intelligently, and voluntarily waived his rights. The court further determined that James's statements to police were voluntary.

(Doc. 9, Exh. 16 at 9-12) (internal footnotes omitted).  The Ohio Court of Appeals determined that the trial court properly denied petitioner's motion to suppress and overruled his assignment of error. *Id*. at 12.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The privilege against self-incrimination applies to the States through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). The Fifth Amendment prohibits the use of a defendant's compelled testimony by the prosecution in its case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985).  The Due Process Clause of the Fourteenth Amendment also prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).  An admission is deemed to be coerced where the conduct of law enforcement officials was such as to overbear the accused's will to resist, thus bringing about a confession not freely self-determined. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).  The ultimate question in coerced confession cases is whether the confession was voluntary, or in other words, "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

In determining whether a confession is voluntary, the ultimate question for a court is "'whether a defendant's will was overborne by the circumstances surrounding the giving of a

confession.'" *Dickerson v. United States,* 530 U.S. 428, 434 (2000) (quoting *Schneckloth,* 412 U.S. at 226). Courts must consider the totality of the circumstances in determining the voluntariness of a confession, including: (1) whether there was police coercion; (2) the length of the interrogation; (3) the location of the interrogation; (4) the continuity of the interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and, (8) whether the suspect was advised of his or her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).[6]  *See Withrow v. Williams,* 507 U.S. 680, 693-94 (1993) (internal citations omitted).

This Court on federal habeas review must presume the correctness of the state court's factual determinations. 28 U.S.C. § 2254(e)(1). Petitioner bears the burden of rebutting such presumptions with clear and convincing evidence. *Id.* Therefore, the state trial court's analysis of subsidiary factual questions in determining the voluntariness of a statement, such as the length and circumstances of the interrogation and assessments of credibility, are entitled to the presumption of correctness accorded to state court findings of fact. *Miller v. Fenton,* 474 U.S. 104, 116-17 (1995).

In the instant case, the state trial court's finding that the testimony of Officer Drexelius was more credible than that of petitioner is entitled to a presumption of correctness. After a review of the transcript from the suppression hearing (Doc. 9, Exh. 31 at Tr. 1-85) and the other evidence in this case, the Court finds that petitioner's confession was voluntary. Petitioner was questioned by police for approximately three hours. (*Id.* at Tr. 28, 30-31). No credible or independent evidence of brutality, force, or undue coercion by the interviewing officers was ever presented at the hearing on

---

[6] Under *Miranda*, an individual taken into custody is guaranteed the right to remain silent and to the assistance of counsel during the custodial interrogation and that the statements obtained in violation of these rights cannot be used by the prosecution. *Miranda*, 384 U.S. at 478-79. A defendant, however, can waive these rights as long as the waiver is voluntary, knowing, and intelligent. *Id.* at 444. The State bears the burden of proving waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

the motion to suppress or at the trial.  Officer Drexelius testified that petitioner told him he had

consumed one 40 ounce beer the prior day, but that he was not currently under the influence of

alcohol at the time of his interrogation, nor did he appear to Officer Drexelius to be under the

influence of any drugs or alcohol. (*Id*. at Tr. 14, 15).  Nor is there evidence that petitioner was

suffering from any serious physical or mental impairments at the time. (*Id*. at Tr. 22).  Officer

Drexelius testified he reviewed the *Miranda* rights with petitioner and petitioner indicated he

understood those rights. (*Id*. at Tr. 13-15, 17-18).  Petitioner also signed a written waiver of his

rights. (*Id*. at Tr. 15, 26).  Officer Drexelius testified that neither he nor his partner threatened or

used physical force against petitioner. (*Id*. at Tr. 22-23).  Although petitioner claimed he was

physically assaulted by Officer Drexelius, the medical records completed upon petitioner's

admission to the Justice Center failed to corroborate any injuries. (*Id*. at Tr. 66, 69-70).

The only evidence of involuntariness of petitioner's confession was his testimony of

mistreatment at the hands of police officers, which the trial court found incredible.  This finding is

entitled to the presumption of correctness, and petitioner has failed to present clear and convincing

evidence to demonstrate that the trial court's determination of a voluntary confession in this matter

was incorrect.  Based on those factual findings, this Court holds that the state court did not err in

finding petitioner's statements voluntary and in holding that his constitutional rights were not

violated by the admission of his confession.  Petitioner, therefore, is not entitled to habeas relief on

his Fifth Ground for relief.

## VII.  GROUND SIX OF THE PETITION IS WITHOUT MERIT.

Ground Six of the petition asserts that trial counsel provided ineffective assistance because

he advised petitioner to plead guilty instead of no contest to the offenses relating to the death of

Tony Johnson, foreclosing his right to appeal the denial of his motion to suppress.

To demonstrate that counsel's performance was constitutionally ineffective, petitioner must show: (1) his counsel made such serious errors that he was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) his counsel's deficient performance prejudiced the defense by undermining the reliability of the result. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner made an insufficient showing on either ground. *Id.* at 697.

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Under the "prejudice" prong of the *Strickland* test, petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the criminal proceedings would have been different. *Id.* at 694.

In a case such as this involving a conviction obtained upon the entry of no contest or guilty pleas, the second "prejudice" prong of the *Strickland* test "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). This means that in order to demonstrate prejudice in the guilty plea context, petitioner must show a reasonable probability exists that, but for counsel's alleged errors, he would not have pleaded guilty and would have insisted on going to trial. *See id.*

Petitioner claims that trial counsel failed to properly advise him that a plea of guilty "would foreclose the possibility of appealing the Court's overruled motion to suppress. Appellant's plea was involuntarily given." (Doc. 1 at 11(a)).

In overruling this assignment of error, the First District Court of Appeals ruled as follows:

29

{¶ 63} In his sixth assignment of error, James argues that he was denied the effective assistance of counsel because he had entered guilty pleas with agreed sentences to two offenses stemming from Tony Johnson's homicide. James contends that counsel should have advised him to plead no contest rather than guilty since guilty pleas with agreed sentences would foreclose his rights to appeal the trial court's denial of his suppression motion as well as his sentences for the offenses.

{¶ 64} The two-part test enunciated in *Strickland v. Washington* applies to challenges to guilty pleas based on the ineffective assistance of counsel. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.

{¶ 65} Our review of the record convinces us that counsel's advice with respect to the guilty pleas was not deficient. In connection with the death of Tony Johnson, James was charged with murder and an accompanying firearm specification, carrying a concealed weapon, and having a weapon while under a disability. James faced a mandatory prison term of 15 years to life for Johnson's murder and a mandatory, consecutive three-year prison term for the specification. In addition, James faced eighteen-month and five-year prison terms for the weapons offenses. All told, for the offenses connected to Johnson's murder, James faced 24 1/2 years to life in prison.

{¶ 66} In exchange for James's guilty pleas, the state agreed to reduce the murder charge to a charge of voluntary manslaughter, thus eliminating the possibility of a second life sentence. The state agreed to dismiss the specification and the concealed-weapon charge. The state further agreed to jointly recommend an aggregate fifteen-year prison term to run concurrently with the life term imposed in connection with Barnes's murder.

{¶ 67} Nothing in the record supports James's assumption that the state would have agreed to these reductions in exchange for no-contest pleas rather than guilty pleas. James's guilty pleas resulted in concurrent sentences for two different homicides. Given such a favorable outcome for James, we decline to conclude that counsel's performance was deficient.

{¶ 68} Moreover, even assuming counsel's advice was deficient, James has failed to demonstrate that he would not have otherwise entered guilty pleas. Prior to accepting the pleas, the trial court engaged in a lengthy dialogue with James to ensure that his pleas were made knowingly and voluntarily, pursuant to Crim.R. 11(C).

{¶ 69} Because James has failed to demonstrate the deficiency of counsel's performance or resulting prejudice, we overrule his sixth assignment of error.

(Doc. 9, Exh. 16 at 15-16) (internal footnotes omitted).

The Ohio Court of Appeals' decision is not an unreasonable application of clearly established federal law.  The Ohio Court of Appeals correctly identified and reasonably applied the proper standard of review clearly established by the Supreme Court in *Strickland* and *Hill* in evaluating petitioner's ineffective assistance of trial counsel claim.  Disagreement by a defendant with tactics and/or strategy will not support a claim of ineffective assistance, and a petitioner in habeas corpus must overcome a presumption that challenged conduct of counsel was a matter of strategy. *Strickland,* 466 U.S. at 689.  The Court of Appeals reasonably concluded that trial counsel exercised reasonable trial strategy in advising petitioner to plead guilty in view of the favorable sentence petitioner received, the lack of evidence showing a no contest plea would have been acceptable to the State, and the voluntary and knowing nature of petitioner's plea, as evidenced by the record of the plea proceeding. (Doc. 9, Exh. 31 at Tr. 728-752).  Petitioner has not demonstrated that his trial counsel's representation fell outside the wide range of reasonable professional assistance.  *See Strickland,* 466 U.S. at 687.  In addition, petitioner has failed to show he would have rejected the guilty plea had he known he was forfeiting his right to appeal the suppression ruling. Therefore, petitioner has failed to satisfy the "prejudice" inquiry of *Strickland*.

Upon review of the state court transcript and records submitted by respondent, this Court concludes that the Ohio courts reasonably applied the *Strickland/Hill* standard in determining that petitioner failed to demonstrate his counsel was ineffective based on the claim before it. Accordingly, petitioner's sixth ground for relief is without merit and should be denied.

## VIII.  GROUND SEVEN OF THE PETITION IS WITHOUT MERIT.

In Ground Seven of the petition, petitioner contends the trial court erred by permitting questioning on cross-examination concerning whether petitioner ever carried a gun. (Doc. 9, Exh. 31

at Tr. 542-546).  Trial counsel's objections were overruled by the trial judge, who permitted the line of questioning for impeachment purposes. (*Id*. at Tr. 545).  The First District Court of Appeals overruled this assignment of error, finding the questioning appropriate under Ohio Evid. Rule 611(B) given the inconsistencies in petitioner's testimony with respect to his possession of a gun. (Doc. 31, Exh. 16 at 17).

"Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 543 U.S. 892 (2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991); *see also Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001), *cert. denied*, 535 U.S. 1031 (2002) (stating in reference to habeas corpus challenge to admission of other-acts evidence that "[s]tate court evidentiary rulings do not rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.") (internal quotation marks and citations omitted); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001) ("Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding.") (internal quotation marks and citation omitted).

Petitioner's claim that the questioning by the prosecutor was improper impeachment testimony is not cognizable on federal habeas review because it involves a violation of state evidentiary rules.  In view of the "wide latitude" given to states with regards to evidentiary matters and rulings under the Due Process Clause, this Court cannot say that petitioner's due process rights

were violated by the prosecutor's questions concerning gun possession. *Seymour*, 224 F.3d at 552.

Ground Seven of the petition should be denied.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2.  A certificate of appealability should not issue with respect to the petition because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner

leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

      IT IS SO RECOMMENDED.


Date: 4/16/2008                         s/Timothy S. Black
                                              Timothy S. Black
                                              United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CARLTON JAMES,                                              Civil Action No. 1:07-cv-330
      Petitioner,

                                              Spiegel, J.

      vs.                                              Black, M.J.

ERNIE MOORE, WARDEN,
      Respondent.


## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

35